**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LOUISE F. YOUNG, a/k/a Louise Y.
Ausman; JAMES R. AUSMAN,
<u>Petitioners-Appellants,</u>

No. 00-1244

v.

COMMISSIONER OF INTERNAL REVENUE,
<u>Respondent-Appellee.</u>

JOHN B. YOUNG; MARTHA H. YOUNG,
<u>Petitioners-Appellees,</u>

v.

No. 00-1261

COMMISSIONER OF INTERNAL REVENUE,
<u>Respondent-Appellant.</u>

Appeals from the United States Tax Court.
(Tax Ct. Nos. 97-21489, 97-20435)

Argued: December 7, 2000

Decided: February 16, 2001

Before WILKINS, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion in
which Judge Michael joined. Judge Wilkins wrote an opinion concur-
ring in part and dissenting in part.

_____

## COUNSEL

**ARGUED:** Frank Hilton Lancaster, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Appellants. Jonathan Samuel Cohen, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William Mimms Claytor, BAUCOM, CLAYTOR, BENTON, MORGAN & WOOD, P.A., Charlotte, North Carolina, for Appellees. **ON BRIEF:** Robert W. Fuller, III, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Appellants. Paula M. Junghans, Acting Assistant Attorney General, Michelle C. France, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee Commissioner.

_____

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

This case presents two tax questions arising from the settlement of a property dispute between former spouses. The first is whether a 1992 transfer of land from a husband to his former wife constitutes a transfer "incident to" their 1988 divorce for purposes of the non-recognition of gain rules. The second is whether the wife must include within her gross income the contingent fees paid directly to her attorneys from the proceeds of her subsequent sale of that land. We agree with the Tax Court's holding that both questions must be answered in the affirmative.

I.

Louise Young**1** and John Young married in 1969 and divorced in

_____

**1** After her divorce from John Young, Louise married James Ausman, another appellant, and became Louise Ausman. Although it is not reflected in the caption of the case, Louise has since divorced and remarried and is now named Louise Rice. To remain consistent with the parties' stipulated facts before the Tax Court, however, we continue to refer to Louise Young.

2

1988. The following year they entered into a Mutual Release and Acknowledgment of Settlement Agreement ("1989 Settlement Agreement") to resolve "their Equitable Distribution [of] Property claim and all other claims arising out of the marital relationship." Pursuant to this agreement, Mr. Young delivered to Mrs. Young a promissory note for $1.5 million, payable in five annual installments plus interest, which was secured by a deed of trust on 71 acres of property that Mr. Young received as part of the same 1989 Settlement Agreement.

In October 1990, Mr. Young defaulted on his obligations under the 1989 Settlement Agreement; the next month Mrs. Young brought a collection action in state court in North Carolina. On May 1, 1991, that court entered judgment for Mrs. Young, awarding her principal, interest, and reasonable attorneys' fees. Mr. Young paid only $160,000 toward satisfaction of that judgment, thus prompting Mrs. Young to initiate steps to execute the judgment. Before execution, however, Mr. and Mrs. Young entered into a Settlement Agreement and Release ("1992 Agreement"), which provided that Mr. Young would transfer to Mrs. Young, in full settlement of his obligations, a 59-acre tract of land (42.3 of the 71 acres that had collaterized his $1.5 million note and 16.7 acres adjoining that tract). Pursuant to the 1992 Agreement, Mr. Young retained an option to repurchase the land for $2.2 million before December 1992. Mr. Young assigned the option to a third party, who exercised the option and bought the land from Mrs. Young for $2.2 million.

On her 1992 and 1993 federal income tax returns, Mrs. Young reported no capital gain from the sale of the property nor the $300,606 portion of the $2.2 million that went directly to pay her attorneys' fees. At the same time, Mr. Young did not report any gain from his transfer of property, in which he had a $130,794 basis, to satisfy his then almost $2.2 million obligation to Mrs. Young. Thus, the appreciation of this property went untaxed despite the occurrence of a taxable event, i.e., the transfer or the sale.

The Commissioner asserted deficiencies against both Mr. Young and Mrs. Young. Each then petitioned the Tax Court, which consolidated the two cases. After trial, the Tax Court ruled that the capital gain was properly taxable to Mrs. Young under 26 U.S.C. § 1041(a)(2) (1994), which provides that "[n]o gain or loss shall be

3

recognized on a transfer of property . . . to . . . a former spouse, . . . if the transfer is incident to the divorce." <u>See Young v. Commissioner</u>, 113 T.C. 152, 156 (1999). Because the Tax Court held that the 1992 property transfer was "incident to the divorce," it concluded that Mr. Young realized no gain through his transfer of this property to his former spouse. <u>Id.</u> Rather, according to the Tax Court, Mrs. Young took Mr. Young's adjusted basis in the land and should have recognized a taxable gain upon the subsequent sale of that property. In addition, the Tax Court held that the portion of the proceeds from the sale, which was paid directly to her attorneys, must be included in Mrs. Young's gross income. As a result of these holdings, the Tax Court ruled that Louise Young and her then husband, James Ausman, owed $206,323 in additional income tax in 1992, and Louise alone owed $262,657 in additional income tax in 1993.

Mrs. Young and James Ausman appeal both rulings. The Commissioner files a protective cross-appeal on the § 1041 issue, urging that if we do not agree with the Tax Court's conclusion that Mrs. Young (and Mr. Ausman) realized taxable capital gains, we also reverse its holding with respect to Mr. Young so that he is required to recognize the gain.

II.

We first consider the Tax Court's ruling involving § 1041, which provides that no taxable gain or loss results from a transfer of property to a former spouse if the transfer is "incident to the divorce." 26 U.S.C. § 1041(a)(2). Section 1041 further provides that "a transfer of property is incident to the divorce" if it is "related to the cessation of the marriage." 26 U.S.C. § 1041(c)(2). The statute does not further define the term "related to the cessation of the marriage," but temporary Treasury regulations provide some guidance. Those regulations extend a safe harbor to transfers made within six years of divorce if also "pursuant to a divorce or separation instrument, as defined in § 71(b)(2)." Temp. Treas. Reg. § 1.1041-1T(b) (2000). Section 71(b)(2) defines a "divorce or separation instrument" as a "decree of divorce or separate maintenance or a written instrument incident to such a decree." 26 U.S.C. § 71(b)(2) (1994). A property transfer not made pursuant to a divorce instrument "is presumed to be not related to the cessation of the marriage." Temp. Treas. Reg. § 1.1041-1T(b).

4

This presumption may be rebutted "by showing that the transfer was made to effect the division of property owned by the former spouses at the time of the cessation of the marriage." Id.

The Tax Court held that the 1992 transfer from Mr. Young to Mrs. Young was "related to the cessation of the marriage," thus neither party recognized a gain or loss on the transfer, and Mrs. Young took the same basis in the land that the couple had when they were married. Young, 113 T.C. at 156. The court applied the regulatory safe harbor provision, but also found that the transfer "completed the division of marital property" and, regardless of the safe harbor provision, it "satisfied the statutory requirement that the transfer be `related to the cessation of the marriage.'" Id. We agree with the Tax Court that the 1992 land transfer was "related to the cessation of the marriage," finding that it "effect[ed] the division of [marital] property." Temp. Treas. Reg. § 1.1041-1T(b).

The factual underpinnings of this case are not questioned. It is undisputed that the parties formulated and entered into the 1989 Settlement Agreement to resolve their "respective claims for equitable distribution of property" and "all other claims arising out of the marital relationship." The parties also agree that the 1992 Agreement was to resolve disputes arising from that 1989 Settlement Agreement. In fact, an entire section of the 1992 Agreement details the marital background of the dispute, beginning with the Youngs' divorce and subsequent execution of the 1989 Settlement Agreement, and expressly provides that the 1992 Agreement was to "fully settle all claims under the Judgment and Deed of Trust" that arose out of the 1989 Settlement Agreement. Not surprisingly then, the Tax Court explicitly found that the 1992 transfer "completed the division of marital property." Young, 113 T.C. at 156.**2**

_____

**2** Whether the transfer effected the division of marital property is an issue of fact, and we cannot reverse the Tax Court's "subsidiary and ultimate findings on this factual issue" unless they are clearly erroneous. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 92 (4th Cir. 1985). Cf. Riley v. Commissioner, 649 F.2d 768, 773 (10th Cir. 1981) (finding no clear error in Tax Court's holding that payments were made in accordance with property settlement and thus were "legal obligation[s] . . . aris[ing] out of a family or marital relationship"). The dissent ignores

5

Nonetheless, Mrs. Young challenges the Tax Court's finding and argues that the 1992 transfer did not "effect the division of [marital] property." In support of her contention, Mrs. Young notes that she was a judgment creditor when she entered into the 1992 Agreement. But the only status relevant for § 1041 purposes is "spouse" or "former spouse." Beyond her position as a former spouse, Mrs. Young's status makes no difference when determining whether the transfer is taxable; § 1041 looks to the character of and reason for the <u>transfer</u>, not to the status of the <u>transferee</u> as a creditor, lien-holder, devisee, trust beneficiary, or otherwise.**3** Indeed, in <u>Barnum v. Commissioner</u>, 19 T.C. 401, 407-08 (1952), although the former wife had obtained a judgment against her husband for alimony arrearage, the Tax Court found the resulting settlement to be "incident to a divorce" because, like the 1992 Agreement in this case, it settled the"dispute over obligations arising from a divorce decree." <u>Id.</u>

_____

this deferential standard of review in concluding that the transfer of marital property was completed when Mr. Young delivered the promissory note to Mrs. Young. <u>See post</u> at 17. There is no reason to hold the Tax Court inappropriately assessed the evidence, certainly no basis for finding the court clearly erred in doing so. That Mr. Young transferred a promissory note to Mrs. Young in 1989 does not change the fact that his 1992 land transfer was also "related to the cessation of marriage." Neither the statute nor the regulations limit § 1041 to only <u>one</u> post-divorce transfer if two or more are "incident to divorce" or necessary to complete the transfer of marital property. Moreover, no gain or loss would have been recognized on Mr. Young's annual payment of his note, nor is there reason to recognize a gain or loss simply because the parties agreed that Mr. Young could satisfy his outstanding obligation in a single transfer. As the Tax Court correctly found, the transfer was not "completed" until Mr. Young paid his obligation in full.

**3** That the 1992 transfer satisfied a judgment does not support the dissent's contention that it was therefore made for"<u>reasons bearing no relationship to the fact that the parties were previously married</u>." <u>Post</u> at 18. This assertion completely overlooks the context in which the judgment was settled and satisfied. The 1992 Agreement itself details the marital "reasons" behind the settlement. Mr. Young did not simply satisfy a judgment, he finally gave "effect" to the"division of [the marital] property." Temp. Treas. Reg. § 1.1041-1T(b).

6

Additionally, Mrs. Young's reliance on a private letter ruling issued to another taxpayer is misplaced. P.L.R. 9306015 (Feb. 12, 1993).[4] In that case, the divorce decree contemplated a sale of the former marital house, in which each spouse owned a one-half interest, to a third party. The IRS ruled that the husband's subsequent sale of his one-half interest in the house to his former wife instead of a third party was an "arm's-length transaction between two parties that <u>happen to be former spouses</u>," and thus did not "effect the division" of marital property pursuant to § 1041 and its regulations. <u>Id</u>. (emphasis added). Because the husband in the private letter ruling had no obligation stemming from the divorce decree to sell his half interest in the home to his wife, the fact that the parties were former spouses truly had no bearing on the sale except as the means of their association. In contrast, Mr. Young transferred the 59 acres to satisfy an obligation that originated from the dissolution of the Youngs' marriage. Mr. Young's transfer of this land was not an independent decision "[un]related to the cessation of the marriage." And Mrs. Young did not just "happen" to be Mr. Young's "former spouse." Instead, the transaction occurred only <u>because</u> she was his former spouse enforcing her rights growing out of the dissolution of their marriage.

Mrs. Young's argument based on state court jurisdiction is no more persuasive. She asserts that the 1992 Agreement could not have effectuated the division of marital property, because the judgment that precipitated the 1992 Agreement was rendered by a North Carolina Superior Court, and not a North Carolina District Court, which "is the proper division . . . for . . . the enforcement of separation or property settlement agreements between spouses, or recovery for the breach thereof." N.C. Gen Stat. § 7A-244. Whatever the merits of this argument as to the jurisdiction of North Carolina courts, it cannot be the basis for a decision as to the federal tax consequences of a transfer of property. The Commissioner does not contend that the suit upon which the 1992 Agreement was based was for "recovery for the breach" of a property settlement agreement under North Carolina law, but only that the 1992 Agreement completed "the division" of marital property under § 1041 of the Internal Revenue Code.

---

[4] We note that Congress has mandated that a private letter ruling, which by its terms is directed only to the taxpayer who requested it, has no precedential value. <u>See</u> 26 U.S.C. § 6110(j)(3)(1994).

7

Nor do we find Mrs. Young's "fairness" argument compelling. She points out that under the 1989 Settlement Agreement she was to receive $1.5 million plus interest, but if forced to pay the capital gains tax she will receive a lesser amount. For this reason, she argues that application of § 1041 to the 59-acre transfer would "result in a radical and unfair re-division of the Young's [sic] marital property." Brief of Appellant at 29. But, this argument overlooks the fact that Mrs. Young <u>agreed</u> to accept the 59 acres in lieu of enforcing her judgment against Mr. Young and receiving a cash payment. For whatever reason -- and the record is silent as to Mrs. Young's motivations -- she chose not to follow the latter route. In addition, if Mrs. Young had agreed to accept land in 1989, as she ultimately did in 1992, the resulting transfer would unquestionably have "effect[ed] the division of [marital] property" and been within§ 1041. That the transfer occurred three years later does not alter its "effect," or its treatment under § 1041.

The sole reason for the 1992 Agreement was to resolve the disputes that arose from the Youngs' divorce and subsequent property settlement. Had the Youngs reached this settlement at the time of their divorce, there is no question that this transaction would have fallen under § 1041. There is no reason for the holding to differ here where the same result occurred through two transactions instead of one.

The policy animating § 1041 is clear. Congress has chosen to "treat a husband and wife [and former husband and wife acting incident to divorce] as one economic unit, and to defer, but not eliminate, the rec-ognition of any gain or loss on interspousal property transfers <u>until the property is conveyed to a third party outside the economic unit</u>." <u>Blatt v. Commissioner</u>, 102 T.C. 77, 80 (1994) (emphasis added).**5** <u>See also</u> H.R. Rep. No. 98-432, at 1491 (1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 1134. Thus, no taxable event occurred and no gain was realized by either Mr. or Mrs. Young until Mrs. Young sold the 59 acres to a third party.

_____

**5** There are of course exceptions in which transfers to third parties "on behalf of" a former spouse are treated as § 1041 transfers, <u>see Arnes v. United States</u>, 981 F.2d 456, 458 (9th Cir. 1992), but this is not such a case.

8

Indeed, holding otherwise would contradict the very purpose of § 1041. Congress enacted that statute to "correct the[ ] problems" caused by <u>United States v. Davis</u>, 370 U.S. 65 (1962), in which "[t]he Supreme Court ha[d] ruled that a transfer of appreciated property to a spouse (or former spouse) in exchange for the release of marital claims results in the recognition of gain to the transferor." H.R. Rep. No. 98-432, at 1491-92 (1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 1134-35. Congress found this result "inappropriate," <u>id.</u>, and thus amended the tax code in 1984 to add § 1041. Given this history, to impute a gain to Mr. Young on his transfer of "appreciated property . . . in exchange for the release of [Mrs. Young's] marital claims" would abrogate clear congressional policy. <u>Id.</u>

The dissent's contention that the result we reach here is not supported by equitable considerations misses the point. Congress has already weighed the equities and established a policy that no gain or loss will be recognized on a transfer between former spouses incident to their divorce. Thus anytime former spouses transfer appreciated property incident to their divorce, the transferee spouse will bear the tax burden of the property's appreciated value after selling it and receiving the proceeds. Although this rule will undoubtedly work a hardship in some cases, the legislature has clearly set and codified this policy. We cannot disregard that choice to satisfy our own notions of equity.

In so concluding, we do not suggest that the boundaries defining when a transfer is "related to the cessation of the marriage" or made "to effect the division of [marital] property" are always clear. We cannot, however, on the facts of this case hold that Mr. Young's "interspousal property transfer" was a taxable event, when the purpose behind Mr. Young's transfer was to satisfy his obligations arising from the "cessation of the marriage." To do so would, we believe, contravene the language, purpose, and policy of§ 1041 and the regulations promulgated pursuant thereto.

III.

The Commissioner also determined that to the extent Mr. Young's transfer of land to Mrs. Young discharged a $300,606 debt to her for legal expenses, it should be included in her gross income. In the Tax

9

Court, Mrs. Young contended that Mr. Young owed the $300,606 in attorneys' fees directly to her attorneys, not to Mrs. Young herself, and so maintained that this amount should not be included in her gross income, regardless of § 1041. The Tax Court found to the contrary. On appeal, Mrs. Young does not challenge this factual finding but nonetheless maintains that the Tax Court erred when it concluded that this $300,606 must be included within her gross income. Mrs. Young argues that, even if this amount was owed to her, she never realized this income and so it should for this reason not be included in her gross income.

Resolution of this question centers on the meaning of "gross income." The Internal Revenue Code provides a very general definition: "[e]xcept as otherwise provided . . . gross income means all income from whatever source derived." 26 U.S.C.§ 61(a) (1994). Moreover, the Supreme Court has given a "liberal construction" to the term "gross income . . . in recognition of the intention of Congress to tax <u>all gains</u> except those specifically exempted." <u>James v. United States</u>, 366 U.S. 213, 219 (1961) (emphasis added); <u>see also Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 430 (1955).

The Court has long held that the assignment to another of income not yet received does not relieve the assignor of tax liability on that income. <u>See Lucas v. Earl</u>, 281 U.S. 111 (1930). In <u>Earl</u>, Justice Holmes reasoned that the Internal Revenue Code "tax[es] salaries to those who earned them" and does not allow a party to escape taxes through "anticipatory arrangements and contracts however skillfully devised to prevent the salary . . . from vesting even for a second in the man who earned it." <u>Id.</u> at 114-15. Similarly in <u>Helvering v. Horst</u>, 311 U.S. 112, 114 (1940), the Supreme Court held that a father could not escape taxation on future interest income by assigning it to his son. In <u>Horst</u>, the father owned negotiable bonds but detached their interest coupons, giving them to his son before they came due. The Court held that the father's gift was an anticipatory assignment of his income because he had earned and enjoyed the benefit of the coupons by directing them to his son. Thus, the father was properly taxed even though the son ultimately collected the interest income.

Under the reasoning of <u>Earl</u> and <u>Horst</u>, Mrs. Young's anticipatory assignment of a portion of her settlement proceeds to her attorneys

10

does not foreclose taxation of those proceeds, i.e., they are nonetheless includible within Mrs. Young's gross income. Mrs. Young asks us, however, to adopt the contingent attorney fee exception to this rule established by the Fifth Circuit in Cotnam v. Commissioner, 263 F.2d 119 (5th Cir. 1959).

Over Judge Wisdom's dissent, the Cotnam court held that, unlike the situation in Earl, a contingent fee was not income to the client but rather income earned directly by her attorneys, because the client's claim was uncertain to be paid at all and thus "worthless without the aid of skillful attorneys." Cotnam, 263 F.2d at 125. Applying this reasoning, the court ruled that the client did not assign "income," but instead "assigned to her attorneys forty per cent of the claim in order that she might collect the remaining sixty per cent." Id. Furthermore, the Cotnam court found that in contrast to the father in Horst, "the only economic benefit to the [client] was an aid to the collection of a part of an otherwise worthless claim." Id. at 126. The Cotnam court also relied on the Alabama Code, which provided that"attorneys . . . have the same right and power over said suits, judgments and decrees, to enforce their liens, as their clients had or may have for the amount due thereon to them." Id. at 125. Because Alabama attorneys have the "same right" over the suit as the client, the court reasoned, the client could never have realized the fee as income to her.

Only one circuit has independently reached the same outcome as Cotnam. See Estate of Clarks v. United States, 202 F.3d 854 (6th Cir. 2000).[6] In that case, the Sixth Circuit similarly reasoned that while the income at issue in Earl and Horst was "already earned, vested and relatively certain to be paid to the assignor," a contingent fee is more similar to a "division of property than an assignment of income," and the "income should be charged to the one who earned it and received it, not . . . to one who neither received it nor earned it." Id. at 857-58. Like Cotnam, Clarks also looked to state law. Under the applicable Michigan law, an attorney only had a lien on a judgment (as opposed to the property "right" provided under the Alabama law in Cotnam),

_____

[6] Since the former Fifth Circuit split, the Eleventh Circuit and the new Fifth Circuit have followed Cotnam on stare decisis grounds. See Srivastava v. Commissioner, 220 F.3d 353, 357-58 (5th Cir. 2000); Davis v. Commissioner, 210 F.3d 1346, 1347 (11th Cir. 2000).

11

nonetheless, the Clarks court concluded that"[a]lthough the underly-ing claim . . . was originally owned by the client, the client lost his right to receive payment for the lawyer's portion of the judgment." Id. at 856.

Mrs. Young urges us to follow Cotnam and Clarks. But to do so would permit a client to avoid taxation by "skillfully devis[ing]" the method for paying her attorneys' fees, the precise danger the Supreme Court warned against in Earl, 281 U.S. at 115. If her attorneys charged an hourly rate, Mrs. Young would certainly have to include within her gross income any income used to pay her legal fees, whether the income came from the settlement proceeds or otherwise. We see no reason to allow her to escape taxation on a portion of the settlement proceeds simply because she arranged to compensate her attorneys directly from the proceeds through a contingent fee arrange-ment. Indeed, the Fifth Circuit itself, although following Cotnam on grounds of stare decisis, has recently recognized that a client with a contingent fee arrangement:

> [O]ught not receive preferential tax treatment from the sim-ple fortuity that he hired counsel on a contingent basis, for his attorney's method of compensation did not meaningfully affect the gain he was able to enjoy from a favorable resolu-tion of the litigation.

Srivastava v. Commissioner, 220 F.3d 353, 363 (5th Cir. 2000)(foot-note omitted).

In addition, Cotnam's holding that the contingent fee was "income to the attorneys but not to [the client]" was based in part on the notion that the client's claim was "worthless without the aid of skillful attor-neys." Cotnam, 263 F.2d at 125. That rationale overlooks the fact that an attorney paid by the hour adds just as much "worth" to a claim as a contingent fee attorney. Moreover, it is undisputed that satisfaction of Mrs. Young's obligation to her attorneys provided her an economic benefit. See Baylin v. United States, 43 F.3d 1451, 1454 (Fed. Cir. 1995). See also Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729 (1929) ("The discharge by a third person of an obligation to him is equivalent to receipt by the person taxed."). That an assignment of income involves a contingent or undetermined amount does not

12

exempt it from taxation to the assignor. See Coady v. Commissioner, 213 F.3d 1187, 1191 (9th Cir. 2000); Baylin, 43 F.3d at 1455 ("That the [client] assigned a portion of its . . . recovery to its attorney before it knew the exact amount of the recovery does not mean that this amount never belonged to the [client].").

We also do not accept the suggestion in Cotnam and Clarks that a contingent fee arrangement gives an attorney a portion of a client's cause of action, see Cotnam, 263 F.2d at 125, or "property." See Clarks, 202 F.3d at 857-58. The client still controls the claim (or property) and ultimately decides to forego, pursue, or settle that claim. The attorney simply provides a service and receives compensation for that service, whether by an hourly rate or through a contingent fee. Indeed, the idea that the attorney merely helps the client earn income from her claim is reinforced by the Tax Court's holding in this case that Mrs. Young could deduct the portion of her legal fees that were "allocable to the recovery of taxable income." Young, 113 T.C. at 157 (emphasis added) (citing Kelly v. Commissioner, 23 T.C. 682, 688 (1955), aff'd 228 F.2d 512 (7th Cir. 1956)).

Nor do we agree with Cotnam and Clarks's (and Mrs. Young's) reliance on state law to settle this federal tax issue. Indeed, there is no relevant distinction between the state common law discussed in Clarks and Baylin, yet those courts reached opposite conclusions.[7] As the Fifth Circuit itself has now recognized, whether amounts paid directly to attorneys under a contingent fee agreement should be included within the client's gross income should be resolved by proper application of federal income tax law, not the amount of con-

_____

[7] Under the law of both Michigan, which was assertedly relevant in Clarks, and Maryland, which was assertedly relevant in Baylin, attorneys have no "right" to the client's income-producing claim but just a lien on the judgment. See Aetna Cas. & Sur. Co. v. Starkey, 116 Mich. App. 640, 645, 323 N.W.2d 325, 328 (1982) ("An attorney's lien is not an assignment but is a specific encumbrance on a fund or judgment which the client has recovered through the professional services of the attorney."); Chanticleer Skyline Room, Inc. v. Greer, 271 Md. 693, 319 A.2d 802, 806 (1974) ("Like any other lien, this lien does not create an ownership interest in the attorney, but merely places a charge upon the fund as security for the debt which is owed to the attorney by his client.").

13

trol state law grants to an attorney over the client's cause of action. See Srivastava, 220 F.3d at 363-64 & n.33. **8**

But, even if we adopted the contingent fee exception established in Cotnam and the view that state law was determinative -- and we do not -- North Carolina law is easily distinguishable from the Alabama statute on which Cotnam relied. The Alabama statute gave the attorney the "same right" over the cause of action as the client, thus arguably providing a right over the income-producing claim. By contrast, the North Carolina common law provides an attorney with a charging lien, which "attaches only to a judgment, not to a cause of action." Dillon v. Consolidated Delivery, Inc., 43 N.C. App. 395, 396, 258 S.E.2d 829, 830 (1979). Consequently, an attorney's right to contingent income matures at the same time the judgment is rendered or settlement achieved -- i.e., when the client's income is earned. And Justice Holmes teaches us that a taxpayer cannot escape taxation by "prevent[ing] the [income] when paid from vesting even for a second in the man who earned it." Earl, 281 U.S. at 115 (emphasis added). There is no indication that a North Carolina attorney paid by contingent fee has acquired rights to the cause of action or a right equal to that of the client. Until judgment, or in this case settlement, the attorney has the right to recover fees for services rendered, but not to obtain a share of the income produced by the client's claim. See Covington v. Rhodes, 38 N.C. App. 61, 64, 247 S.E.2d 305, 308 (1978). The attorney does not, as Mrs. Young suggests, own the claim itself.

Accordingly, we join the majority of those circuits to have addressed this issue and decline to adopt the Cotnam exception. See Coady v. Commissioner, 213 F.3d 1187 (9th Cir. 2000); Alexander v. IRS, 72 F.3d 938 (1st Cir. 1995); Baylin, 43 F.3d 1451 (Fed. Cir. 1995); O'Brien v. Commissioner, 38 T.C. 707 (1962), aff'd 319 F.2d 532 (3d Cir. 1963). See also Bagley v. Commissioner, 105 T.C. 396, 418-19 (1995) (holding, without mentioning Cotnam, that settlement portion paid to attorneys pursuant to contingent fee was income to cli-

_____

**8** Moreover, Congress amended the tax code in 1984 in part to "carry out the congressional purpose of avoiding different tax consequences because of differences in state laws." Kitch v. Commissioner, 103 F.3d 104, 107 (10th Cir. 1996) (citing H.R. Rep. No. 98-432, at 1491-92, 1495, reprinted in 1984 U.S.C.C.A.N. 697, 1134-35, 1137).

14

ent), aff'd 121 F.3d 393 (8th Cir. 1997). Rather, the $300,606, although directly paid to Mrs. Young's attorneys under a contingent fee agreement was, as the Tax Court held, properly includible in her gross income.

IV.

Therefore, the Tax Court's judgment is in all respects

AFFIRMED.

WILKINS, Circuit Judge, concurring in part and dissenting in part:

The majority affirms the determination of the Tax Court that the 1992 property transfer from John Young to his former wife Louise was "incident to" the Young's divorce and that Louise must include as her income the contingent fees paid directly to her attorneys from the sale of the land transferred. I concur regarding the contingency fee issue but respectfully dissent regarding whether the 1992 property transfer was incident to the Young's divorce. I would conclude that a property transfer made between former spouses to satisfy a judgment is not made "incident to" the parties' divorce merely because the lawsuit that produced the judgment was for default on a promissory note obtained in the parties' divorce property settlement.

I.

The issue in dispute here is which former spouse is responsible for paying capital gains taxes as a result of the substantial appreciation of the transferred property that occurred prior to the time John used the property to satisfy his debt to Louise.[1] The answer to that question depends on whether the 1992 transfer was a taxable event. If it was,

_____

[1] John's basis in the property was $130,794. He transferred the land to Louise to satisfy a debt totaling $2,153,845, including $1,500,000 in principal, $344,938 in interest, $300,606.08 in attorney's fees, and $8,300 in collection costs. John reported no capital gain from his use of the appreciated property to satisfy his debt. Louise sold the property for $2,265,000 and reported a $100,000 short-term capital gain and $356,500 in interest income.

15

then John owed capital gains taxes and Louise received a basis that reflected the fact that the property had appreciated substantially prior to her receiving it. If it was not, then John owed no capital gains taxes and Louise took the property at John's previous, much lower basis. I believe the applicable law demonstrates that the 1992 transfer was a taxable event and therefore capital gains taxes were due and payable by John as a result of this transaction.

The parties agree that the 1992 property transfer was a taxable event unless 26 U.S.C.A. § 1041 applies. That section provides that "[n]o gain or loss shall be recognized on a transfer of property . . . to . . . a former spouse . . . if the transfer is incident to the divorce." 26 U.S.C.A. § 1041(a)(2) (West Supp. 2000). A transfer is "incident to the divorce" if it either "occurs within 1 year after the date on which the marriage ceases" or "is related to the cessation of the marriage." Id. § 1041(c). A temporary Treasury regulation interpreting § 1041 in turn provides, in pertinent part, that a transfer is deemed "related to the cessation of the marriage" when made within six years of the divorce and "pursuant to a divorce or separation agreement." Temp. Treas. Reg. § 1.1041-1T(b) (2000). On the other hand, "[a]ny transfer not pursuant to a divorce or separation instrument . . . is presumed to be not related to the cessation of the marriage." Id. The regulation further states that "[t]his presumption may be rebutted only by showing that the transfer was made to effect the division of property owned by the former spouses at the time of the cessation of the marriage." Id.

The majority does not address the question of whether the 1992 agreement to satisfy the judgment was a "divorce or separation instrument," but concludes that the Government met its burden of proving that the property transfer "was made to effect the division of [marital] property." I will briefly explain why I believe the property transfer was not a "divorce or separation instrument" and then explain why I believe it is incorrect to conclude that the property transfer "was made to effect the division of [marital] property."

A.

The term "divorce or separation instrument" appears in 26 U.S.C.A. § 71, which pertains to alimony and separate mainte-

16

nance payments. That section defines "divorce or separation instrument," as pertinent here, as "a decree of divorce or separate maintenance or a written instrument incident to such a decree." 26 U.S.C.A. § 71(b)(2)(A) (West 1988). It is undisputed that the settlement agreement is not a decree of divorce or separate maintenance. Accordingly, it qualifies as a "divorce or separation instrument" only if it is "a written instrument incident to""a decree of divorce or separate maintenance."

Words not defined in a statute are given their ordinary meaning. See Scrimgeour v. Internal Revenue, 149 F.3d 318, 327 (4th Cir. 1998). "Incident" means "dependent upon, appertaining or subordinate to, or accompanying something else of greater or principal importance." Black's Law Dictionary 762 (6th ed. 1990). Here, the 1992 agreement did not bear such a close relationship to the divorce decree. Instead, the 1988 divorce decree and the 1992 agreement were connected only indirectly: The 1992 agreement settled a dispute that arose out of the 1989 division of property that occurred as a result of the parties' 1988 divorce. Nothing in the divorce decree or the property division compelled the land transfer contemplated in the 1992 agreement. Accordingly, the settlement document does not fit the definition of a "divorce or separation instrument."

B.

The determination that the 1992 settlement agreement is not a "divorce or separation instrument," as that term is defined in § 71, gives rise to a presumption that the property transfer was not related to the cessation of the marriage. In order to rebut that presumption, the Government was required to show "that the transfer was made to effect the division of [marital] property." Temp. Treas. Reg. § 1.1041-1T(b). Because the division of marital property was completed years before the property transfer--when the parties released their marital claims against one another and Louise accepted the promissory note--I would hold that the Government failed to make the necessary showing.

A property transfer is not made for the purpose of effecting a marital property division when the marital property division has already

17

been completed.[2] The Youngs completed this division when John delivered the promissory note to Louise. His payments on the note did not transfer marital property; the note itself accomplished that. Neither were the payments inherently marital, as alimony is. Instead, John's obligations on the note were the obligations of a debtor to a creditor and were no more intimate than a mortgage. Accordingly, although the judgment arising from John's default on the note was causally related to the marital property division, that division had been completed and the <u>marital</u> economic ties between the Youngs had been severed before the 1992 transfer occurred.[3] The 1992 property transfer was made simply to satisfy a judgment between them, <u>for reasons bearing no relationship to the fact that the parties were previously married</u>. In other words, John owed a debt to Louise because of the marriage, but they did not agree to settle the debt by a land transfer because of the marriage.

Indeed, the fact that the parties' status as former spouses did not affect their decision to make the transfer in question was also the

_____

[2] The majority states that the statement made by the Tax Court that the 1992 transfer "completed the division of marital property" was a finding of fact that we must accept unless clearly erroneous. <u>See ante</u> at 5-6 n.2. Clearly, however, the statement was a conclusion of law, not a finding of fact. The Tax Court specifically set out its "FINDINGS OF FACT" at the beginning of its opinion, <u>Young v. Comm'r</u>, 113 T.C. 152, 154-55 (1999); the statement cited by the majority appears in the section of the opinion labeled "OPINION." <u>Id.</u> at 156. And, even without this delineation, it is apparent that the statement is no finding of fact. This case was decided on stipulated facts, and the determination that "[t]he 1992 Agreement resolved a dispute arising under the 1989 Property Settlement and completed the division of marital property" simply described how the 1992 agreement related to the property division. <u>Id.</u> There is no reason for us to give deference to this analysis by the Tax Court of stipulated facts. Because the statement is a conclusion of law, our standard of review is de novo. <u>See Waterman v. Comm'r</u>, 179 F.3d 123, 126 (4th Cir. 1999).

[3] This factor distinguishes <u>Barnum v. Commissioner</u>, 19 T.C. 401 (1952), cited by the majority. In that case, the agreement addressed existing alimony rights of the parties. <u>See Barnum</u>, 19 T.C. at 407. Furthermore, it is important to note that the <u>Barnum</u> court was not guided by the temporary Treasury regulation that guides our decision today.

18

basis for private letter ruling 9306015. <u>See</u> Priv. Ltr. Rul. 9306015 (Feb. 12, 1993). There, the divorce decree contemplated a sale to a third party of the former marital house, in which each spouse owned an interest. Nevertheless, eight years after the parties' divorce, the husband sold his interest in the home to his former wife. The IRS ruled that because the sale was simply "an arm's-length transaction between two parties that happen to be former spouses," the transfer was not made to effect the division of marital property. <u>Id.</u> The majority attempts to distinguish this ruling by asserting that, unlike the parties in the private letter ruling, the Youngs were not simply "two parties that happen to be former spouses" because the circumstances that led John to make the 1992 transfer were created by the marital property division. <u>See ante</u>, at 7. Clearly, however, the IRS' characterization of the parties in the private letter ruling as "happen[ing] to be former spouses" did not refer to the history of the circumstances leading to the sale; indeed, the sale was the direct result of circumstances arising from the marriage. Rather, the characterization referred to the husband's purpose in making the transfer. Regardless of whether the husband's shared interest in the house arose from his prior marriage, that history did not affect his decision to sell his interest to his joint owner. The same principle applies here. Regardless of the fact that John's status as a judgment debtor arose from his prior marriage, that history did not affect his decision to satisfy the judgment by making the 1992 transfer. Accordingly, as in the private letter ruling, the 1992 transfer was simply "an arm's-length transaction between two parties that happen to be former spouses," and it cannot be said that the 1992 transfer was "made to effect the division of [marital] property."

The majority concludes that the 1992 property transfer should not be treated as a taxable event because that would have been the result had Louise agreed to the property transfer as part of the 1989 divorce settlement.[4] <u>See id.</u> at 8. Although like transactions should indeed receive like treatment under the tax code, the hypothetical transaction offered by the majority and the transaction that actually occurred are not alike. In fact, they differ in the most critical way: In the hypothetical, Louise would have obtained the property as a means of severing

_____

[4] Of course, Louise did not agree to this. She agreed to receive from John $1.5 million tax free to her over a five-year period.

19

her economic union with her former spouse, thereby justifying treatment of the transfer as if it were made within a single economic unit, whereas in the actual transaction, the property was transferred after the Youngs' economic union had already been completely severed. See H.R. Rep. No. 98-432, at 1491-92 (1984), reprinted in 1984 U.S.C.C.A.N. 697, 1134 (noting that the reason that transfers between spouses are not taxed is "that a husband and wife are a single economic unit"). Accordingly, the hypothetical transfer would have been "made to effect the division of [marital] property," while the actual transaction was not. In contrast, John's transfer of the property to Louise to satisfy a judgment should not be treated differently from a sale by John to Louise of the property. Each property transfer is simply an arm's-length exchange of property for valuable consideration between people who happen to be former spouses, and no valid tax policy would justify treating these like transactions differently.**5**

If the words "made to effect the division of [marital] property" were interpreted in a vacuum, the majority's interpretation might be plausible, but when one considers the anomolous results produced by the majority's interpretation, its incorrectness becomes apparent. It is wrong to conclude that the Treasury Department intended to treat differently two arm's-length property transfers between former spouses based on the fact that in one the transferee pays cash for the property and in the other she allows the transfer to satisfy a judgment. It is therefore just as wrong to conclude that the Treasury Department intended that the line between tranfers "made to effect the division of [marital] property" and transfers not made to effect such a division would be drawn where the majority draws it today.

One final aspect of this case deserves mention. From the majority's decision to interpret the applicable regulation in a manner that is supported neither by the language of the regulation nor by any valid tax policy, one might infer that unmentioned equitable considerations

_____

**5** Indeed, the premise that the sale of the property to Louise would have been a taxable event but the transfer of the property in satisfaction of the judgment was not leads to the strange result that the tax treatment of the 1992 transaction could have been changed simply by structuring the transaction as a sale of the property to Louise, with the proceeds to be used to satisfy the judgment.

20

weigh in favor of the majority's result. Just the opposite is true, however. By holding that the 1992 transfer was a § 1041 transaction, the majority provides a substantial windfall of several hundred thousand dollars to a defaulting debtor while at the same time punishing a creditor who accepted a settlement instead of litigating her claims (which would have resulted in a satisfaction of the judgment without the tax burden she now faces).[6]

For all of these reasons, I believe that the 1992 transfer was not "incident to the divorce," and thus the transfer of the property was a taxable event to John. I respectfully dissent from the majority's conclusion to the contrary.

_____

[6] The majority misunderstands my discussion of fairness. I do not suggest that equitable considerations should trump the language of § 1041 or the applicable regulation. Rather, I only point out that in addition to the fact that the majority's holding appears unguided by any coherent tax principle and produces anomolous results, it yields a tremendously unfair result for Louise Young.

21