**David A. RAYMOND and Lori Raymond, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 2:01–CV–142.

United States District Court, D. Vermont.

Dec. 17, 2002.

---

James Wayland Runcie, Ouimette & Runcie, Vergennes, VT, for David A Raymond, Lori Raymond, plaintiffs.

Lydia Bottome, Esq., U.S. Department of Justice, Trial Attorney, Tax Division, Washington, DC, for United States of America, defendant.

## OPINION AND ORDER

SESSIONS, Chief Judge.

In this action to recover an alleged overpayment of taxes, Plaintiffs David A. Raymond and Lori Raymond ("the Raymonds") and Defendant United States of America ("the IRS") have filed cross-motions for summary judgment, asserting that there are no material facts at issue in this proceeding, and that each is entitled to judgment as a matter of law. For the reasons that follow, the Raymonds' motion (Doc. 9) is granted, and the IRS's motion (Doc. 14) is denied.

The material facts are not in dispute.[1] After being terminated from employment at IBM in 1993, Plaintiff David Raymond retained the law firm of Ouimette & Runcie to represent him in a wrongful termination suit. The firm filed a complaint against IBM in 1995 in the United States District Court for the District of Vermont, Civil Action Docket Number 2:95–cv–158.

Under the fee agreement between Raymond and his attorneys, the firm would receive a contingency fee of 1/3 of the net

---

1. To obtain summary judgment, a party must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When cross-motions for summary judgment are filed, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993).

recovery, plus expenses. Any fees incurred as a result of an appeal were to be paid at an hourly rate.[2]

Trial by jury resulted in a verdict in favor of Raymond in the amount of $869,156.00. Judgment was entered on the verdict on July 14, 1997. The judgment was affirmed on appeal by the United States Court of Appeals for the Second Circuit. After appeal, IBM satisfied the judgment in a total amount of $929,585.90, including $60,429.90 in interest. IBM broke down the total amount as follows:

| | |
|---|---|
| Interest | $ 60,429.90 |
| Check to Raymond | $548,107.84 |
| Federal Income Tax Withholding | $243,363.68 |
| Social Security Tax | $ 16,843.56 |
| State Income Tax Withholding | $ 60,840.92 |
| | |
| Total | $929,585.90 |

IBM sent checks for the interest and principal to Ouimette & Runcie. After receipt by the law firm, Raymond's share of the proceeds was deposited into his account at the Chittenden Bank and Ouimette & Runcie's share was deposited into its account at the Chittenden Bank. Of the total amount recovered, Ouimette & Runcie received $306,898.01 under the contingency fee agreement, and an additional $32,732.11 in attorneys' fees and expenses for the appeal.

On the Raymonds' original 1998 federal income tax return, they included in their adjusted gross income the entire amount of the judgment, including the amounts paid as attorneys' fees. Because of the amount of their income for that year, the Raymonds' income tax was determined by the Alternative Minimum Tax ("AMT"). Ordinarily they would have been able to take a miscellaneous deduction for their attorneys' fees to the extent those fees exceeded 2% of their adjusted gross in-

come, but miscellaneous deductions are not allowed under the AMT. The effect of the inclusion of the entire amount of the judgment as income and the operation of the AMT was to require the Raymonds to pay income tax on the full $929,585.90, although $306,898.01 of that amount went directly to their attorneys.

On December 28, 1999, the Raymonds filed an amended federal tax return and requested a refund of $55,489.00. On the amended return, the Raymonds excluded from their income amounts paid to Ouimette & Runcie under the contingency fee agreement. On April 14, 2000, the Raymonds' request for refund was denied by the IRS. They filed the instant suit for recovery of internal revenue taxes pursuant to 28 U.S.C. § 1346(a)(1) in the United States District Court for the District of Vermont on May 4, 2001.

## DISCUSSION

■ Under the Internal Revenue Code, "gross income means all income from whatever source derived." 26 U.S.C.A. § 61(a) (2002); see also 26 C.F.R. § 1.61–1 (2002) (gross income includes income realized in any form). In the landmark case of Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955), the United States Supreme Court emphasized the "sweeping scope" of the definition of gross income, "in recognition of the intention of Congress to tax all gains except those specifically exempted." Id., 348 U.S. at 429–30, 75 S.Ct. 473. Although the Internal Revenue Code's definition of gross income is to be broadly construed, exclusions from income are to be narrowly

---

**2.** The specific wording of the contingent fee arrangement in Raymond's retainer agreement was: "Mr. Raymond agrees to pay Ouimette & Runcie as legal fees a sum equal to one-third of the net amount recovered by Mr. Raymond by settlement or judgment, after the deduction of reasonable expenses incurred in the prosecution of this matter." Retainer Agreement at ¶ 2 (Doc. 11, App.A).

construed, however. *Taggi v. United States*, 35 F.3d 93, 95 (2d Cir.1994).

■ Not all economic gain to a taxpayer is taxable income. Generally the "realization" of income—when the income is paid—is the taxable event, rather than the acquisition of the right to receive it. *Helvering v. Horst*, 311 U.S. 112, 115, 61 S.Ct. 144, 85 L.Ed. 75 (1940). Realization occurs when the taxpayer "obtains the fruition of the economic gain which has already accrued." *Id.* This rule has not been interpreted as permitting a taxpayer to escape taxation because the taxpayer has not personally received payment, however. *See id.*, 311 U.S. at 116, 61 S.Ct. 144. Thus if a taxpayer arranges for a creditor to be paid directly from income due the taxpayer, "he does not escape taxation because he did not actually receive the money." *Id.*

At issue is whether fees paid directly to an attorney under a contingency fee agreement should be excluded from the client's gross income because it was income to the attorney and not to the client. There is a split of authority on the subject; the Fifth, Sixth and Eleventh Circuits exclude contingency fees from clients' gross incomes; the Third, Fourth, Seventh, Ninth, Tenth and Federal Circuits include them. *See Campbell v. Comm'r*, 274 F.3d 1312, 1314 (10th Cir.2001), *cert. denied*, 535 U.S. 1056, 122 S.Ct. 1915, 152 L.Ed.2d 824 (2002); *Kenseth v. Comm'r*, 259 F.3d 881, 885 (7th Cir.2001); *Young v. Comm'r*, 240 F.3d 369, 379 (4th Cir.2001); *Coady v. Comm'r*, 213 F.3d 1187, 1191 (9th Cir.2000), *cert. denied*, 532 U.S. 972, 121 S.Ct. 1604, 149 L.Ed.2d 470 (2001); *Davis v. Comm'r*, 210 F.3d 1346, 1347 (11th Cir.2000) (per curiam); *Estate of Clarks v. United States*, 202 F.3d 854, 858 (6th Cir.2000); *Baylin v. United States*, 43 F.3d 1451, 1454 (Fed.Cir. 1995); *O'Brien v. Comm'r*, 319 F.2d 532, 532 (3rd Cir.1963) (per curiam); *Cotnam v. Comm'r*, 263 F.2d 119, 126 (5th Cir.1959).

The Second Circuit has not had occasion to decide the issue.

Those courts that have included contingency fees paid directly to attorneys as gross income to their clients have relied on the anticipatory assignment of income doctrine first articulated in *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930). The anticipatory assignment of income doctrine was devised to prevent a taxpayer from assigning income before it is realized in order to avoid the tax consequences of earning it. Traditionally, the doctrine was applied to the donative transfer of income or property between family members. *See id.*, 281 U.S. at 113–14, 50 S.Ct. 241; *Horst*, 311 U.S. at 114, 61 S.Ct. 144; *see also Comm'r v. Sunnen*, 333 U.S. 591, 602–03, 68 S.Ct. 715, 92 L.Ed. 898 (1948).

In *Lucas v. Earl*, a husband and wife agreed to grant to each spouse one-half of their respective incomes. On the husband's tax return, he claimed only one-half of the income he earned. Justice Holmes, writing for a unanimous Court, concluded that the husband could not avoid paying tax on income he earned by making an anticipatory assignment of that income to another:

> There is no doubt that the [Revenue Act of 1918] could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.

*Id.*, 281 U.S. at 114–15, 50 S.Ct. 241. The essence of the doctrine thus was that in-

come should be taxed to the one who earns it. *See also United States v. Basye,* 410 U.S. 441, 447, 93 S.Ct. 1080, 35 L.Ed.2d 412 (1973).

In *Helvering v. Horst,* a taxpayer owner of negotiable bonds made a gift to his son of the interest coupons prior to the bonds' maturity. The taxpayer, who continued to keep the bonds, was required to include the interest in his gross income: "[h]e, who owns or controls the source of the income, also controls the disposition of that which he could have received himself." *Id.,* 311 U.S. at 116–17, 61 S.Ct. 144. Had the taxpayer transferred the bonds themselves, he would have given up the right to control the disposition of the income and would not have been taxed. In sum, the Court concluded, "[t]he power to dispose of income is the equivalent of ownership of it." *Id.,* 311 U.S. at 118, 61 S.Ct. 144.

The Court continued to employ the *Lucas v. Earl* orchard metaphor in *Horst,* stating that "[t]he import of the [1934 Revenue Act (taxing interest as well as income derived from wages)] is that the fruit is not to be attributed to a different tree from that on which it grew." *Id.,* 311 U.S. at 120, 61 S.Ct. 144. It distinguished the situation in which a gift of income-producing property is made, as opposed to a gift of income derived from property, using another agricultural metaphor: "[u]nlike income thus derived from an obligation to pay interest or compensation, the income [from trust property] was regarded as no more the income of the donor than would be the rent from a lease or a crop raised on a farm after the leasehold or the farm had been given away." *Id.,* 311 U.S. at

119, 61 S.Ct. 144 (citing *Blair v. Comm'r,* 300 U.S. 5, 12, 13, 57 S.Ct. 330, 81 L.Ed. 465 (1937)[3]).

■ The critical factor in determining whether a taxpayer has engaged in an anticipatory assignment of income is the degree of control over the asset that the taxpayer has retained. *See Sunnen,* 333 U.S. at 604, 68 S.Ct. 715 ("crucial question remains whether the assignor retains sufficient power and control over the assigned property or over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes"); *Srivastava v. Comm'r,* 220 F.3d 353, 363–64 (5th Cir.2000); *see also White v. Fitzpatrick,* 193 F.2d 398, 402 (2d Cir.1951) (tax consequences of intra-family transfer determined by ascertaining who has retained practical ownership of asset).

But courts have differed in their characterization of the degree of control that a taxpayer has retained over the fee portion of a judgment subject to a contingent fee arrangement. As the Fifth Circuit panel discussed in *Srivastava,*

> [t]he question, therefore, is one of characterization, and, as we have recognized, is not always easy to apply in particular cases. . . .
>
> [C]ontingent fee contracts defy easy categorization, standing as they do somewhere between the two poles—on the one hand, an obvious scheme to evade taxation through diversion of future income streams to another, and on the other hand, full and complete divestment of an income source.

---

**3.** *Blair* involved the tax treatment of a trust beneficiary's assignment to his children of an interest in the net income of the trust. The trust had been created by the beneficiary's father, and entitled the beneficiary during his lifetime to the net income of the property held in trust. *Blair,* 300 U.S. at 13, 57 S.Ct. 330. The beneficiary was "the owner of an equita-

ble interest in the corpus of the property," and was entitled to assign all or part of that interest. *Id.* Upon assignment, the assignees "became the owners of the specified beneficial interest in the income," and were taxable on that income. *Id.,* 300 U.S. at 14, 57 S.Ct. 330.

220 F.3d at 360. It acknowledged that "when a client hires an attorney to prosecute a claim on his behalf, control over that claim ... is neither fully divested to the attorney nor fully retained by the taxpayer-client." *Id.* The panel announced candidly that application of the control test left it in a quandary. *Id.*

The Seventh Circuit, however, summarily rejected a taxpayer's claim that he relinquished control over his legal claim by entering into a contingent fee agreement: "[the taxpayer] no more relinquished control of the claim to his contingent-fee lawyer than he would have to a fixed-fee lawyer. He could fire either one and would owe either one for work done but not paid for." *Kenseth,* 259 F.3d at 884.

That assessment notwithstanding, those courts that have excluded contingency fees from clients' gross income have concluded that the clients did relinquish control over a portion of their potential judgment, often relying on state law interpretations of attorneys' liens. *See Cotnam,* 263 F.2d at 125; *Estate of Clarks,* 202 F.3d at 856. *But see Srivastava,* 220 F.3d at 364–65 n. 33 (declining to recognize meaningful distinction among state laws governing contingency fees). These courts have stressed the intangible or speculative nature of the property transferred, concluding that ownership of a portion of any recovery passed to the attorney long before it constituted any more than wishful thinking: "[h]ere there was no res, no fund, no proceeds, no vested interest, only a hope to receive money from the lawyer's efforts and the client's right, a right yet to be determined by judge and jury." *Estate of Clarks,* 202 F.3d at 857; *see also Srivastava,* 220 F.3d at 363 (before judgment or

settlement, claim is of uncertain value, discussing *Cotnam* ).

If the issue is defined as whether the taxpayer-client has given up ownership or control over the lawsuit itself by entering into a contingent fee agreement, then the answer is clear: he or she has not.[4] With all due respect for the *Kenseth* panel however, the debate should not concern whether or to what extent the taxpayer-client has given up control over the legal claim. The issue should rather be whether the taxpayer-client ever had or could have had control over the portion of the anticipated judgment that was designated to his or her attorneys. If, at the time the transfer under the contingent fee agreement was made, the taxpayer's rights had not yet ripened to the point that he or she was entitled to the gain, then the taxpayer should not be taxed on that transferred portion. *See Greene v. United States,* 13 F.3d 577, 581 (2d Cir.1994) (anticipatory assignment of income doctrine applies where fixed right to income has matured at time transfer is made); *see also Wood Harmon Corp. v. United States,* 311 F.2d 918, 926 n. 5 (2d Cir.1963) (anticipatory assignment of income doctrine applies when "assignor is entitled at the time of the assignment to receive the income at a future date, and is vested with such a right," quoting *Cold Metal Process Co. v. Comm'r,* 247 F.2d 864, 873 (6th Cir.1957)).

State law determines the nature of a legal interest in property, although federal law determines whether that interest was intended to be taxed. *See Morgan v. Comm'r,* 309 U.S. 78, 80, 309 U.S. 626, 60 S.Ct. 424, 84 L.Ed. 585 (1940); *see also Aquilino v. United States,* 363 U.S. 509, 512–13, 80 S.Ct. 1277, 4 L.Ed.2d 1365

---

**4.** Under Vermont law, for example, trial counsel has "control over procedural matters incident to litigation; the client has control over the subject matter of litigation." *New England Educ. Training Service, Inc. v. Silver St. P'ship,* 148 Vt. 99, 102, 528 A.2d 1117, 1119 (1987). This is true, of course, regardless of the nature of the fee arrangement.

(1960) (in application of federal revenue act, state law controls in determining nature of taxpayer's legal interest). Vermont law provides that "[w]here the parties have contracted that the attorney shall receive a specified amount of the recovered fund, such agreement will create an equitable lien on the fund in favor of the attorney to the extent of the amount stipulated." *Estate of Button v. Anderson,* 112 Vt. 531, 534–35, 28 A.2d 404, 406 (1942); *see also Barnes v. Alexander* 232 U.S. 117, 120, 34 S.Ct. 276, 58 L.Ed. 530 (1914) (contract for contingent fee constitutes lien upon fund awarded, citing *Wylie v. Coxe,* 56 U.S. (15 How.), 415, 420 14 L.Ed. 753 (1853)).

Such a lien is not an automatic feature of every contract for a contingent fee; "[t]he test is whether the party contracting for the services sufficiently indicates an intention to make the fund described in the contract security for the debt." *Button's,* 112 Vt. at 536, 28 A.2d at 407. This intent may be implied from the circumstances, and if it appears that the parties looked to the recovery rather than to the owner of the claim for payment of attorneys' fees, then the contingent fee agreement has created an equitable lien. *Id.; see also Valley Disposal Inc. v. Cent. Vt. Solid Waste Mgmt. Dist.,* 113 F.3d 357, 363 (2d Cir. 1997) (discussing *Button* ).

The parties in the instant case do not dispute that Raymond and Ouimette & Runcie intended that attorneys' fees for the case, excluding fees on appeal, would be taken from any recovery obtained, and would not become Raymond's personal obligation. Accordingly, under Vermont law, an equitable lien on the IBM recovery was created in favor of Ouimette & Runcie. *Button's,* 112 Vt. at 536, 28 A.2d at 407.

■ A contract that creates a lien for attorneys' fees upon the recovery associated with a claim

before the allowance of the claim, and before any services ha[ve] been rendered by the attorney, ... in effect, ... g[ives] him an interest or share in the claim itself[;] ... it transfer[s] or assign[s] to the attorney, in advance of the allowance of the claim, such an interest as would secure the payment of the fee stipulated to be paid.

*Nutt v. Knut,* 200 U.S. 13, 20, 26 S.Ct. 216, 50 L.Ed. 348 (1906); *see also Cotnam,* 263 F.2d at 125 (attorney holding equitable assignment or lien has an interest in cause of action and recovery under it); *Pittman v. United States,* 127 Ct.Cl. 173, 116 F.Supp. 576, 579 (1953) (contingent fee contract between attorney and client gave attorney an interest in client's claim).[5]

Given that, according to the United States Supreme Court's ruling in *Nutt,* a contingent fee contract effectively confers an interest in the claim itself upon the attorney, the contingent fee agreement operates more like an assignment of income-producing property than an assignment of future income from property. *See Foster,* 249 F.3d at 1280; *Estate of Clarks,* 202 F.3d at 857–58; *cf. Harrison v. Schaffner,* 312 U.S. 579, 583–84, 61 S.Ct. 759, 85 L.Ed. 1055 (1941) (noting that the line between the two may be difficult to distinguish in some cases); *Heim v. Fitzpatrick,* 262 F.2d 887, 889 (2d Cir.1959) (question whether transfer is one of income or of income-producing property is not free from doubt). Several features of the con-

---

**5.** Contingent fee contracts in civil cases represent a specific exception to the ethical prohibition against acquiring "a proprietary interest" in a client's cause of action. *See, e.g.,* Vt. Rules of Prof'l Conduct R. 1.8(j)(2)(1999) (lawyer shall not acquire proprietary interest in cause of action or subject matter of litigation, except that lawyer may contract with client for reasonable contingent fee in civil case).

tingent feé agreement reinforce this conclusion. First, the client who obtains legal services on a contingent fee basis incurs no personal obligation for the services provided. *See Button's,* 112 Vt. at 536, 28 A.2d at 407; *see also Barnes,* 232 U.S. at 121, 34 S.Ct. 276; *Kenseth v. Comm'r,* 114 T.C. 399, 439, 2000 WL 669977 (2000) (Beghe, J., dissenting). The attorney has no recourse if there is no recovery; if there is a recovery the attorney has a lien on—an equitable interest in—the funds recovered. Because the client has not incurred a personal obligation, it scarcely seems logical to conclude, as have panels in the Ninth, Tenth and Federal Circuits, that payments under contingent arrangements serve to discharge clients' personal obligations to their attorneys, and therefore, under the rule of *Old Colony Trust,* should be taxed to the clients. *See Old Colony Trust Co. v. Comm'r,* 279 U.S. 716, 729, 49 S.Ct. 499, 73 L.Ed. 918 (1929) (discharge by third person of taxpayer's obligation is equivalent to receipt by taxpayer); *Campbell,* 274 F.3d at 1313–14 (recovery permitted taxpayer to discharge personal obligation owed to attorneys); *Coady,* 213 F.3d at 1191 (taxpayer could not avoid tax by diverting portion of recovery to her creditor contingent fee counsel); *Baylin,* 43 F.3d at 1454 (funds served to discharge obligation of partnership to its attorney).

Second, at the time the taxpayer transfers an interest, it has not matured or ripened into a right to enjoy a gain. It is not that the amount of potential recovery is speculative; it is that the nature if not the existence of the taxpayer's right to receive any recovery has yet to be determined at the time he has given up a portion of that right to his attorney. *See Estate of Clarks,* 202 F.3d at 857 (Clarks had no predetermined property interest before entering contingency fee arrangement) [6]; *see also Greene,* 13 F.3d at 581 (2d Cir.1994) (if a fixed right to income has not matured at time of transfer, proceeds are not income to transferor, construing anticipatory assignment of income doctrine in charitable donation case); Aaron C. Charrier, *Taxing Contingency Fees: Examining the Alternative Minimum Tax and Common Law Tax Principles,* 50 Drake L.Rev. 315, 340 (2002) (at time of entering into contingent contract, taxpayer has not realized any income; his benefit derives from contingent agreement itself).

Third, contingent fee contracts are not employed as a "skillfully devised," *Earl,* 281 U.S. at 115, 50 S.Ct. 241, tax avoidance scheme, but to provide greater access to legal services, often in doubtful or risky cases, where the clients cannot afford to pay attorneys to pursue their claims. *See*

6. *Lucas v. Earl*'s orchard metaphor was refined in *Estate of Clarks* in an attempt to represent the contingent fee relationship more accurately:

> [h]ere the client as assignor has transferred some of the trees in his orchard, not merely the fruit from the trees. The lawyer has become a tenant in common of the orchard owner and must cultivate and care for and harvest the fruit of the entire tract.... The situation is no different from the transfer of a one-third interest in real estate that is thereafter leased to a tenant.

202 F.3d at 858.

Perhaps the most apt agricultural metaphor was created by the dissent in the Tax Court's opinion in *Kenseth,* however, who analogized the contingent fee agreement to cropsharing:

> [t]he attorney is in the position of the tenant farmer, who bears all his direct and overhead expenses incurred in earning the contingent fee.... The client is in the position of the landowner ..., who bears none of the operating expenses, but is responsible for paying the carrying charges on his land.... [C]ropsharing arrangements result in a division of the crops and the total gross revenue from their sale in the agreed upon percentages. This income is characterized as rental income to the owner or lessee of the land and farm income to the tenant-farmer.

*Kenseth,* 114 T.C. at 455 (citation omitted).

Charrier, 50 Drake L.Rev. at 321–22. Applying the assignment of income doctrine to attorneys' contingency fees is inconsistent with the purpose of the doctrine, which was adopted to thwart tax avoidance schemes. *See Earl,* 281 U.S. at 114, 50 S.Ct. 241; *Basye,* 410 U.S. at 449–50, 93 S.Ct. 1080.

■ Because the contingency fee agreement is not a tax avoidance scheme, operates more like income-producing property than income from property, and in any event does not satisfy the substantial control test of the assignment of income doctrine, this Court holds that the portion of Raymond's recovery that was paid directly to his attorneys under their contingent fee agreement was not income to Raymond. Because the IRS incorrectly required this amount to be included in the Raymonds' 1998 income, the Raymonds are entitled to a refund on their 1998 taxes. The Raymonds' motion for summary judgment is, accordingly, granted; the IRS's motion for summary judgment is denied.