David A. RAYMOND and Lori
Raymond, Plaintiffs–
Appellees,

v.

UNITED STATES of America,
Defendant–Appellant.

No. 03–6037.

United States Court of Appeals,
Second Circuit.

Argued: Nov. 21, 2003.

Decided: Jan. 13, 2004.

James W. Runcie, Esq., Ouimette & Runcie, Vergennes, VT, for Plaintiffs–Appellees.

Kenneth W. Rosenberg, Esq., Tax Division, Department of Justice (Eileen J. O'Connor, Assistant Attorney General, Richard Farber, Department of Justice, on the brief, Peter W. Hall, United States Attorney for Vermont, of counsel), Washington, D.C., for Defendant–Appellant.

Before: OAKES, POOLER, and WESLEY, Circuit Judges.

WESLEY, Circuit Judge.

The Supreme Court has long asserted that "[i]n tax law, ... substance rather than form determines tax consequences." *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 570, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991) (Blackmun, J., dissenting) (citing *Comm'r v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945)). In this appeal, we are presented with an issue in which the line between substance and form has blurred. The question presented is whether a taxpayer who receives a recovery for lost wages, and who agreed to pay his attorney on a contingent-fee basis, must include the contingent fee in his gross income. We answer that question in the affirmative.

## I. Facts & Procedural Posture

Appellee-taxpayer Raymond entered into a contingent fee agreement with the law firm of Ouimette & Runcie, under which the firm agreed to represent Raymond in his wrongful termination suit against IBM in return for one-third of any recovery secured thereunder. In a jury trial in the United States District Court for the District of Vermont, Raymond prevailed; the court entered judgment on the jury's award of approximately $900,000. IBM satisfied the judgment by sending a check to Ouimette & Runcie, payable to Raymond. The firm deposited approximately $300,000 in its own account in satisfaction of the contingent fee agreement.

On his federal income tax return for 1998, Raymond initially included in his gross income the entire amount of the

judgment. From his gross income he attempted to deduct the amount of the fees paid to Ouimette & Runcie. *See* 26 U.S.C. § 212(1). However, due to the amount of Raymond's gross income, his tax liability was controlled by the Alternative Minimum Tax ("AMT"). As legal fees are among the itemized deductions that may not offset the AMT, *see* 26 U.S.C. § 56(b)(1)(A)(i), Raymond's tax liability was based on the sum of the entire judgment proceeds and his household income of approximately $65,000. Accordingly, his tax liability for 1998 was approximately $275,000.[1]

In December 1999, Raymond filed an amended 1998 return. On the amended return, he *excluded* from his gross income the amount paid to Ouimette & Runcie under the contingent fee agreement. This exclusion eliminated Raymond's AMT liability. Given the resulting adjustments on the amended return, Raymond calculated his tax liability for 1998 as approximately $220,000. He thus claimed the IRS owed him a refund of approximately $55,000. The IRS denied the claim.

Raymond filed suit in the United States District Court for the District of Vermont, pursuant to 28 U.S.C. § 1346(a)(1), challenging the IRS's denial of his refund claim. *See Raymond v. United States*, 247 F.Supp.2d 548 (D.Vt.2002). He moved for summary judgment contending that, as a matter of law, the amount paid as a contingent fee to his attorney was not includable in his gross income. The government cross-moved for summary judgment, arguing that the entire amount of the judgment

was includable as gross income. The government maintained that the amount paid to Raymond's attorney was only deductible as a miscellaneous itemized deduction, as Raymond had claimed in his original return.

The district court granted Raymond's motion for summary judgment, holding the contingent fee excludable from gross income. *Id.* at 556. The court held that, under Vermont law, a contingent fee agreement between taxpayer and attorney gives rise to an equitable lien in favor of the attorney on the taxpayer's recovery. *Id.* at 554 (citing *Estate of Button v. Anderson*, 112 Vt. 531, 28 A.2d 404, 406 (1942)). This equitable lien, the court reasoned, effects a transfer to the attorney of a proprietary interest in the taxpayer's claim. *Id.* Thus, because the amount of the recovery used to pay the attorney's fee represents only the attorney's interest in the claim, it is gross income to the attorney, but not to the taxpayer. The court viewed Raymond as having an insufficient interest in that amount to permit a characterization of it as "income" to him. The government appealed.

## II. Discussion

Whether contingent fees are includable in the gross income of a client recovering on a judgment is the subject of much debate among the circuit courts.[2] The majority position is that such fees are includable in the client's gross income. *See Campbell v. Comm'r*, 274 F.3d 1312 (10th Cir.2001); *Kenseth v. Comm'r*, 259 F.3d

---

1. From Raymond's judgment, IBM had withheld approximately $243,000 for federal income tax. On his 1998 return, Raymond reported total withholdings of approximately $257,000. He thus owed approximately $18,000.

2. It is settled law that some recoveries, such as those for "personal physical injuries or physical sickness," are excluded from the definition of gross income. 26 U.S.C. § 104(a)(2); *see also Duse v. IBM Corp.*, 252 F.3d 151, 160 (2d Cir.2001). Raymond's recovery of lost wages does not enjoy this exclusion.

881 (7th Cir.2001); *Young v. Comm'r*, 240 F.3d 369 (4th Cir.2001); *Baylin v. United States*, 43 F.3d 1451 (Fed.Cir.1995). The minority position is that contingency fees are income to the attorney, but not to the client. *See Davis v. Comm'r*, 210 F.3d 1346 (11th Cir.2000); *Estate of Clarks v. United States*, 202 F.3d 854 (6th Cir.2000); *Cotnam v. Comm'r*, 263 F.2d 119 (5th Cir. 1959).[3]

■ Courts to address the issue have generally recognized that, in applying a federal revenue act, state law determines the nature of legal interests in property, while federal law determines the tax consequences of the receipt or disposition of property. *See United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985); *Aquilino v. United States*, 363 U.S. 509, 513–14, 80 S.Ct. 1277 (1960). Thus, the courts have typically first analyzed state law to determine the relative strength of the respective interests in the contingency fee. Where the attorney's interest in the fee is sufficiently strong, some courts—those in the minority—have held that the attorney has a "property" interest in it exclusive of the client's interest; from this, these courts conclude that the fee was never income to the client, but only to the attorney. Other courts—those in the majority—have determined that although state law might provide attorneys with an interest in the fee, that interest is merely a "security" interest; from this, they conclude that the fee is plainly income to the

client, albeit income upon which the attorney has a lien.[4]

Notwithstanding the prevalence of state-law analysis in this area, several courts have expressly disavowed reliance on such analysis. In *Young*, the Fourth Circuit stated that "whether amounts paid directly to attorneys under a contingent fee agreement should be included within the client's gross income should be resolved by proper application of federal income tax law, not the amount of control state law grants to an attorney over the client's cause of action." *Young*, 240 F.3d at 378. And in *Banks v. Commissioner*, 345 F.3d 373 (6th Cir.2003), the court reversed the Tax Court's determination that the fee was includable in gross income, despite the fact that the contingent fee agreement was controlled by *California* law, thus diverging from *Benci–Woodward* on *federal* grounds. *See id.* at 385–86; *see also Srivastava v. Comm'r*, 220 F.3d 353, 363–64 (5th Cir.2000).

Before turning to the analysis of the present case, it should be noted that the minority position in this area is weaker than it may first appear, at least quantitatively. The Fifth Circuit was the first to speak on this issue, and it held that contingent fees are not includable in the gross income of the client. *See Cotnam*, 263 F.2d at 125. In *Cotnam*, the court held that, under Alabama law, a contingent fee arrangement effected an assignment of a portion of the client's claim to her attorney as of the date she entered into the contingent fee arrangement.[5] This assignment,

---

3. The Ninth Circuit has held both that contingency fees are includable in the client's gross income *and* that they are not—depending on the state law involved. *Compare Coady v. Comm'r*, 213 F.3d 1187 (9th Cir.2000) (includable under Alaska law), *and Benci–Woodward v. Comm'r*, 219 F.3d 941 (9th Cir.2000) (includable under California law), *with Banai-*

*tis v. Comm'r*, 340 F.3d 1074 (9th Cir.2003) (not includable under Oregon law).

4. Indeed, to the extent that most courts to consider the issue have indicated that the analysis of state law is determinative, this is perhaps not a true "circuit split."

5. The court relied heavily on the fact that Alabama law provided attorneys with liens

reasoned the court, sufficiently deprived the client of control over that portion of the claim such that income derived therefrom was not the client's, but rather the attorney's.

Since *Cotnam*, only two circuit courts have defended the view originally articulated in that case. In *Srivastava*, the Fifth Circuit engaged in a lengthy analysis demonstrating why the *majority* position appears most sound—but then followed *Cotnam* as a matter of stare decisis. *See Srivastava*, 220 F.3d at 357–65. And in *Davis*, the Eleventh Circuit followed *Cotnam* insofar as it serves as "former Fifth Circuit" precedent—but offered no argument in its support. *See Davis*, 210 F.3d at 1347.[6] This leaves just the Sixth and the Ninth Circuits as having independently supported the position that contingent fees may be excluded from a client's gross income—the former on federal grounds and the latter on state grounds. *See Banks*, 345 F.3d at 386; *Banaitis*, 340 F.3d at 1083. With that as our backdrop, we enter the fray.

 Section 61(a) of the Internal Revenue Code defines "gross income" as "all income from whatever source derived." 26 U.S.C. § 61(a). The Supreme Court has broadly construed this definition "in recognition of the intention of Congress to tax all gains except those specifically exempted." *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 430, 75 S.Ct. 473, 99 L.Ed. 483 (1955). Still, the Court has long held that income is not taxable unless and until it is "realized." *See Helvering v. Horst*, 311 U.S. 112, 115, 61 S.Ct. 144, 85 L.Ed. 75 (1940). That is, a gain is taxable not when the taxpayer acquires the right to receive it, but rather when the taxpayer receives the benefit of it. *See id.* And a taxpayer can receive the benefit of a gain not only by being *paid*, but also by otherwise "obtain[ing] the fruition of the economic gain which has already accrued to him." *Id.* For example, a taxpayer realizes income when a third party satisfies a financial obligation of the taxpayer; the taxpayer is treated as having received that amount as income and is taxed accordingly. *See Old Colony Trust Co. v. Comm'r*, 279 U.S. 716, 729, 49 S.Ct. 499, 73 L.Ed. 918 (1929). This is true regardless of whether the amount ever passed through the taxpayer's hands. *See Horst*, 311 U.S. at 116, 61 S.Ct. 144.

In addition to explaining that income is not taxable unless and until realized in some form, the Supreme Court has crafted the "anticipatory assignment of income" doctrine, under which taxpayers are prevented from avoiding the realization of income. *See Lucas v. Earl*, 281 U.S. 111, 114–15, 50 S.Ct. 241, 74 L.Ed. 731 (1930); *Horst*, 311 U.S. at 119–20, 61 S.Ct. 144. In *Earl*, a husband and wife contracted in 1901 that they would hold all of their future income as joint tenants. *Earl*, 281 U.S. at 113–14, 50 S.Ct. 241. On his tax returns for 1920 and 1921, the husband thus claimed only half the income earned in those years.[7] The Court held that the

---

against fees earned, and that "attorneys at law shall have the same right and power over ... suits, judgments and decrees, to enforce their liens, as their clients had or may have for the amount due thereon to them." *Cotnam*, 263 F.2d at 125 (quoting 46 Code of Alabama § 64 (1940)).

**6.** The *Davis* court explained that it was bound by *Cotnam* because only an en banc court

could overrule that case. *See Davis*, 210 F.3d at 1347 n. 4.

**7.** When *Earl* was decided, married couples could not yet file joint tax returns as one economic unit. *See* WILLIAM A. KLEIN ET AL., FEDERAL INCOME TAXATION 667–71 (12th ed.2000) (discussing how Congress first permitted "income splitting" between married couples in 1948, how this initially created a

husband's taxable income was determined not by the anticipatory contract with his wife, but rather by the amount the husband actually earned in the tax years in question. Justice Holmes wrote:

> There is no doubt that the [Code] could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.

*Earl,* 281 U.S. at 114–15, 50 S.Ct. 241. The doctrine is a practical necessity in a system of graduated taxation; without it, a taxpayer in a high tax bracket could avoid heightened levels of taxation by simply shifting income to a lower-bracket taxpayer. Although this *may* not have been the intention of the husband and wife in *Earl,* the Court declined to give weight to "the motives leading to the arrangement," presumably because such a "motives" test would be judicially intractable and subject to abuse.[8]

The Court applied the doctrine again in *Horst.* In that case, the taxpayer made a gift of bond coupons to his son—but retained the bonds. His son redeemed the coupons in the same year. In completing his income tax return, the taxpayer failed to include the redemption proceeds in his gross income. *Horst,* 311 U.S. at 114, 61 S.Ct. 144. The Court held that the taxpayer was obligated to include the bond interest in his gross income. *Id.* at 120, 61 S.Ct. 144. Justice Stone wrote that "he, who owns or controls the source of the income, also controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants." *Id.* at 116–17, 61 S.Ct. 144. Further, the Court declared that "[t]he power to dispose of income is the equivalent of ownership of it." *Id.* at 118, 61 S.Ct. 144. Because the taxpayer had retained control of the bonds, he retained control of the disposition of the income. That is, he retained the power to divert the income to his son. He "gained" by receiving the satisfaction of giving the income to his son. That gain constituted gross income.

■ At least two notions seem to be at the heart of the holding in *Horst.* First,

---

"marriage bonus"—and corresponding "singles penalty"—and how a subsequent adjustment to the rate structure eliminated the singles penalty, but created the current "marriage penalty").

8. In that same year, the Supreme Court also held that a married couple could "split" income derived from property co-owned by operation of law, in a community property state. *See Poe v. Seaborn,* 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239 (1930). The difference between *Seaborn* and *Earl,* and between *Seaborn* and the present case, is twofold. First, the *Seaborn* Court stressed that, there, "the earnings [were] *never* the property of the husband, but that of the community," whereas in *Earl,* the agreement was effectively premised on the

notion that one-half of the husband's property would be assigned to his wife upon receipt. *Id.* at 117, 51 S.Ct. 58 (emphasis added). Second, the *Seaborn* Court appears to have given some weight to the fact that the property was co-owned "by law." *Id.; see also Armantrout v. Comm'r,* 67 T.C. 996, 1007, 1977 WL 3650 (1977), *aff'd per curiam,* 570 F.2d 210 (7th Cir.1978) (noting the "consensual nature of the method of compensation" in determining that the portion of a taxpayer's compensation placed directly into a college fund constituted gross income). We believe that Raymond's *private* agreement to assign a portion of *his* income to his attorney is more akin to *Earl* than it is to *Seaborn.*

as the district court noted, *see Raymond,* 247 F.Supp.2d at 552, the Court distinguished between assigning income-producing property and assigning income derived from property still controlled by the taxpayer. When a taxpayer effects the former, he is not properly treated as the recipient of income derived therefrom; in such a case, the taxpayer has relinquished control over the disposition of the income. But when a taxpayer effects the latter, he is treated as the recipient of income despite having "shifted" it to another. Distinguishing between the two turns on the extent to which the taxpayer has retained control of the "source of the income." *Horst,* 311 U.S. at 116, 61 S.Ct. 144.

■ Second, *Horst* emphasizes that the "realization" of income—the "gain" derived from it—can take many forms. The key is that through controlling the disposition of income, the taxpayer has received some benefit. The Court explained of the taxpayer's gift of interest coupons:

Such a use of his economic gain, the right to receive income, to procure a satisfaction which can be obtained only by the expenditure of money or property, would seem to be the enjoyment of the income whether the satisfaction is the purchase of goods at the corner grocery, the payment of his debt there, or such non-material satisfactions as may result from the payment of a campaign or community chest contribution, or a gift to his favorite son. Even though he never receives the money he derives money's worth from the disposition of the coupons which he has used as money or money's worth in the procuring of a satisfaction which is procurable only by the expenditure of money or money's worth. The enjoyment of the economic benefit accruing to him by virtue of his acquisition of the coupons is realized as completely as it would have

been if he had collected the interest in dollars and expended them for any of the purposes named.

*Horst,* 311 U.S. at 117, 61 S.Ct. 144. Thus, the two notions are interrelated. Where a taxpayer assigns income-producing property to another, thereby relinquishing control over it, that taxpayer gives up the power to use that property in such a way as to realize a gain, tangible or intangible. But where a taxpayer retains control over an income-producing asset, thereby retaining control of the disposition of the income, that taxpayer has the power to gain through the satisfaction of assigning its income to whomever he pleases. Such a gain is gross income.

In the present case, the district court first examined Vermont law to determine the respective legal interests in the contingency fee in question. In *Button,* the Vermont court held that an attorney has an "equitable lien" on the amount of his contingency fee. *Button,* 28 A.2d at 406. Further, the district court noted that the Supreme Court has indicated that when an attorney has a lien for his fees, he has "an interest or share in the claim itself." *Raymond,* 247 F.Supp.2d at 554 (quoting *Nutt v. Knut,* 200 U.S. 13, 20, 26 S.Ct. 216, 50 L.Ed. 348 (1906)). From these propositions, the district court concluded that, in Vermont, a "contingent fee agreement operates more like an assignment of income-producing property than an assignment of future income from property." *Raymond,* 247 F.Supp.2d at 554. That is, when a client agrees to a contingent fee arrangement, he assigns to his attorney not merely the future income to be generated from the claim, but rather a portion of the claim from which future income will flow. He has "transferred some of the trees in his orchard, not merely the fruit from the trees." *Id.* at 555 n. 6 (quoting *Estate of Clarks,* 202 F.3d at 858). Thus, the court

concluded contingent fee arrangements do not violate the anticipatory assignment of income doctrine first articulated in *Earl.*

In *Button,* the State of Vermont hired a law firm to prosecute a claim against the United States. The firm was to be paid on a contingent fee basis. Vermont won its case, but the state treasurer refused to pay the fee on the ground that the state constitution required any payment from the treasury be made by special appropriation from the legislature. The Vermont Supreme Court held that the agreement between the state and the firm created "an equitable lien on the fund in favor of the attorney to the extent of the amount stipulated." *Button,* 28 A.2d at 406. In discussing whether satisfying that lien contravened the state constitution, the court stated:

> Although the legal title to the whole fund no doubt is in the State, the petitioners have equitable rights to that portion of the same which represents their fee. This part in all equity and good conscience belongs to them. They have earned it and should receive it. This portion of the fund *never legally and equitably belonged* to the State as part of its public funds for, at the latest, when received, the lien attached to it and remains upon it so that it is held by the State subject to the same.

*Id.* at 410 (emphasis added). The court thus directed the state treasurer to pay the firm its fee.

Raymond argues that the strong language used in *Button* indicates that, under Vermont law, the interest that an attorney has in the contingent-fee portion of a judgment is a *property* interest. The client never owns it. Therefore, just as the taxpayer in *Cotnam* had an insufficient interest in the fee to make it taxable to her, the

taxpayer in the present case never owned the contingent-fee portion of his judgment. It was not his income. However, Raymond's argument seems to rely on a narrow conception of ownership. To be sure the clients in *Button* and in the present case never had a right to retain that portion of their judgments represented by their attorneys' fees. But the concept of property is not exhausted by the right to possess; it is also about the right to control. It is clear that, for tax purposes, exercising the right to "control[ ] the disposition" of a fund is sufficient for the realization of taxable income. *Horst,* 311 U.S. at 116–117, 61 S.Ct. 144.

Further, a close reading of *Button* itself indicates that the lien in question was something less than a proprietary interest. Rather, the lien was a security interest in a fund owned by the client. In *Button,* the court distinguished between an "equitable lien" on a contingent fee and an attorney's "charging lien" on such a fee. *See Button,* 28 A.2d at 407. Although the difference between the two is not entirely clear from the opinion, it appears that the former provides a stronger interest in the fee. But in any case, the *Button* court made it clear that an "equitable lien" does not "arise merely by virtue of a contract for a contingent fee. The test is whether the party contracting for the services sufficiently indicates an intention to make the fund described in the contract security for the debt." *Id.* Two things follow from this. First, it is questionable whether Raymond's attorney had an interest in the fee any stronger than an ordinary charging lien. And second, even if he had a stronger "equitable lien," such a lien is, in the words of *Button,* a matter of having "security for the debt." It is a security interest. One does not—indeed need not—have a security interest in one's own property.[9]

---

**9.** Other language in *Button* supports reading it as providing for a security interest rather

Finally, Vermont, like many states, retains a rule against champerty. *See* Vt. Rule Prof. Cond. 1.8(j). Vermont does provide for the common exception that an attorney and client may agree to a contingent fee arrangement, and *Button* provides that the attorney has a lien on that portion of the recovery representing his fee. But "neither a lien nor a contractual right is 'proprietary.'" *Kenseth,* 259 F.3d at 884. The *Kenseth* court similarly recognized that, "under Wisconsin law (as under that of every other state, as far as we know), . . . the [attorney] had a lien on the proceeds of any settlement or judgment to the extent of the contingent fee." *Id.* at 882. Nevertheless, the Seventh Circuit declined to conclude that the lien precluded the fee from being gross income of the client. For all of these reasons, we decline to conclude that Vermont law provides attorneys with a proprietary interest in their clients' claims.

■■ In any event, we should remember that we are interpreting federal tax law. The analysis of whether something is "gross income" begins with whether it can reasonably be considered a "gain" to the taxpayer under 26 U.S.C. § 61(a). *See Glenshaw Glass,* 348 U.S. at 429–30, 75 S.Ct. 473. Raymond argues that he never received these funds. Indeed, he had no right to them, given the lien placed on them under Vermont law. However, as *Horst* makes clear, a taxpayer can realize a gain subject to taxation where, although he "never receives the money he derives money's worth from the disposition of [the source of the income] which he has used as money or money's worth in the procuring of a satisfaction which is procurable only by the expenditure of money or money's worth." *Horst,* 311 U.S. at 117, 61 S.Ct. 144. Raymond "control[led] the source of the income [and] . . . divert[ed] the payment from himself to others as the means of procuring the satisfaction of his wants." *Id.* at 116–17, 61 S.Ct. 144. He diverted a portion of his judgment to his attorney in the service of receiving the remainder of that judgment—certainly a result "procurable only by the expenditure of money or money's worth." *Id.* at 117, 61 S.Ct. 144. Accordingly, the judgment flowing to Raymond is income to him, and the expense of producing that income—his attorney's fee—is a deductible expense. *See* § 212(1). That the Alternative Minimum Tax precludes Raymond from taking advantage of that deduction is unfortunate, *see Kenseth,* 259 F.3d at 884–85, but it is not a reason to create an artificial contingent-fee exception to the rule that one is taxable on income from a source over which one retains control.

The district court suggested that Raymond did not control the portion of his judgment earmarked for his attorney. *See Raymond,* 247 F.Supp.2d at 553. This is true in a narrow, proximate sense; once he agreed to a contingent fee arrangement, Raymond gave up his right to a portion of his judgment once a judgment was obtained. However, the same was true in *Horst.* There, the taxpayer gave up his right to the interest derived from his bond

---

than a proprietary interest. For example, in the text immediately following the passage relied upon by Raymond, the *Button* court stated:

> It is not necessary to determine the exact nature of these equitable rights which the petitioners have in the fund for all of the cases having to do with such liens recognize that the owner of the same can enforce such rights against the *owner of the fund* in the way of securing payment from the fund in satisfaction of the lien.

*Button,* 28 A.2d at 410 (emphasis added). This passage can only be read to imply that the attorney seeking to press his interest against a contingent fee is *not* the "owner of the fund."

coupons. But there, as here, the taxpayer controlled the source of the income. In *Horst,* it was the taxpayer's bond. Here, it was Raymond's claim against IBM. He could have fired his attorney. He could have dropped the case. He, and only he, had the power to authorize a settlement of the claim.[10] In this case and in *Horst* the taxpayers diverted income from their "property." In each, the taxpayers gained by doing so. Indeed, as in *Horst,* Raymond's income was "realized as completely as it would have been if he had collected the [judgment] in dollars" and then paid his attorney. *Horst,* 311 U.S. at 117, 61 S.Ct. 144. Thus, in the face of *Earl* and *Horst,* Raymond asks this Court to permit him to engage in an anticipatory assignment of income.

The district court offered three further observations in support of its conclusion that contingent fee arrangements fall outside the doctrine of anticipatory assignment of income. First, the court stated that under such an arrangement the client "incurs no personal obligation for the services provided." *Raymond,* 247 F.Supp.2d at 555. This suggestion is apparently meant to remove this case from the rule that a when a third party—here IBM— satisfies a taxpayer's personal obligation to another, that taxpayer is treated as the recipient of gross income. *See Old Colony,* 279 U.S. at 729, 49 S.Ct. 499. Under a contingent fee agreement, if there is no recovery, the client owes the attorney nothing (save expenses). Thus, the district court concluded, the payment of the contingent fee to the attorney is not the satisfaction of the client's obligation—and therefore is not a "gain" to the client. However, it is not clear that the district court is correct that there is no personal obligation running from client to attorney

that is satisfied by the payment of the contingent fee. If the client were to fire the attorney (without cause) prior to securing a judgment, and thus had the entire judgment in hand, the attorney would utilize his lien to retrieve—from the client— his portion of that judgment. When this payment is made directly to the attorney in the normal case, it arguably satisfies an obligation for which the client contracted when agreeing to the fee arrangement. It seems no less the satisfaction of an obligation here.

Second, the court noted that at the time the client transfers the right to payment to the attorney, the "existence of the taxpayer's right to receive any recovery has yet to be determined." *Raymond,* 247 F.Supp.2d at 555. The court suggested that this tells against treating the agreement as an assignment of income because, at the moment assigned, it is merely the assignment of a potentiality. At that time, the client has *no* right to any income, and thus cannot be thought to "shift" that income. Similarly, Raymond argues that the anticipatory assignment doctrine should not apply to contingent fee situations because in contrast to the taxpayer in *Horst,* he had no right to any future income when he contracted with his attorney. As the Sixth Circuit explained, at the time of the execution of the fee agreement, there "was no res, no fund, no proceeds, no vested interest, only a hope to receive money from the lawyer's efforts and the client's right, a right yet to be determined by judge and jury." *Estate of Clarks,* 202 F.3d at 857. But the same could be said of *Earl.* There, the husband and wife agreed to co-own any future income each might earn. There existed no sum certain at the time of the agreement, and yet once the husband earned income and claimed that a

---

**10.** Indeed, if Raymond's attorney had this power, a conflict of interest would necessarily

result. Hence the need for a rule against champerty.

portion of it had shifted to his wife, the Court found it to be an improper assignment of income. In both this case and *Earl*, the taxpayers assigned the right to receive a portion of as yet unascertained income to another. And in both cases, the assignment was "ineffective to shift ... tax liability." *Kenseth*, 259 F.3d at 884.[11]

Third, the district court stressed that contingent fee arrangements are "not employed as a 'skillfully devised' tax avoidance scheme, but to provide greater access to legal services, often in doubtful or risky cases, where the clients cannot afford to pay attorneys to pursue their claims." *Raymond*, 247 F.Supp.2d at 555 (internal citation omitted). Once again *Earl* is instructive. There, Justice Holmes declined to give weight to the "motives leading to the arrangement by which the fruits are attributed to a different tree. from that on which they grew." *Earl*, 281 U.S. at 115, 50 S.Ct. 241. In *Earl*, the husband and wife may, in fact, have agreed to share assets not out of a desire to avoid taxes, but rather out of a sense of marital equity.[12] But Holmes implicitly recognized that to rest the applicability of a rule of law on ascertaining the "motives" of the parties is to court procedural unmanageability. If courts were to attempt to permit the anticipatory assignment of income only when employed for the best of intentions, they would find themselves in the position of having to divine the unknowable—and would open the door to abuse. Although contingent fee arrangements are undoubtedly one way to permit plaintiffs to bring suit when they otherwise might be financially unable, the exclusion of contingent fees from a client's gross income has the potential to "create an artificial, a purely tax-motivated, incentive to substitute contingent for hourly legal fees." *Kenseth*, 259 F.3d at 884.

Further, Raymond suggests that this case is relevantly different than *Horst* insofar as, here, the question is whether to treat only the attorney, or the attorney *and* the client, as having received income. In *Horst*, the transaction was a gift from father to son, and the question was whether to treat the father *or* the son as the recipient of income. But it makes little sense to distinguish between circumstances in which an attorney is paid on an hourly basis and those in which the client and attorney have agreed to a contingent fee arrangement. *Cf. Kenseth*, 259 F.3d at 884. When a client pays an attorney on an hourly basis, the same fund generates gross income for each; the fund simply passes through the client's hands first. There seems no reason to treat contingent fee arrangements differently.

### III. Conclusion

In sum, although the relative interests that attorney and client have in the contingent fee portion of a judgment are relevant to the taxation of that fund, state-law concepts of those interests must be read in the context of federal tax policies. We do not read Vermont law as providing attorneys with a proprietary interest in their clients' claims. Further, determining to whom income flows depends in large part upon who controls the source of the income. When a taxpayer is in sufficient

---

**11.** It is clear that Raymond's chose in action vested him with a proprietary interest. He could potentially have borrowed against it or even assigned it to another—provided the other was not an attorney. It is this limitation on the power to assign that leads us to conclude that Raymond assigned not a proprie-tary, but rather a security, interest in his claim.

**12.** That Mr. Earl was an attorney may shed some light on this question. *See Earl*, 281 U.S. at 113, 50 S.Ct. 241.

control of the source of income, federal principles of taxation deem him the recipient of gross income upon its disposition. This is such a case. And at least in this case, we believe the result supports the primacy of substance over form. Raymond secured a judgment. He paid his attorney. The form that payment took is immaterial. Therefore, we reverse the district court's ruling and remand with instructions to grant summary judgment to the government and dismiss the complaint.